Filed 8/31/23  Credit Card Services v. Chuang CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CREDIT CARD SERVICES, INC., | B306223 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC487454 |
| v. | |
| JOE TEH CHUANG et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Gregory Keosian, Judge.  Affirmed.

Park & Lim, S. Young Lim and Jessie Y. Kim for Plaintiff and Appellant.

Genga & Associates and John M. Genga for Defendants and Appellants.

Appellants in these cross-appeals are plaintiff Credit Card Services, Inc. dba Bankcard Services (BCS) and defendants Joe Teh Chuang, Seung Il Byun aka Sam Byun, and Zhi Xian Su aka Andrei Su (individual defendants); Man J World, Inc. and USMS International, Inc. (together, USMS)[1]; and United Merchant Services, Inc. (UMS) (collectively, defendants).[2]

BCS provides credit card payment processing services for small businesses. BCS established a branch office in El Monte specifically to serve ethnic Chinese merchants. BCS alleged defendants misappropriated BCS's trade secret merchant list by using it to set up USMS, a seller of credit card processing services that competed with BCS's El Monte branch; the individual defendants—former BCS employees—breached their contracts with BCS by poaching BCS's clients and employees for USMS; and Su breached his duty of loyalty by sending BCS merchants to USMS while still working for BCS.

The individual defendants and USMS stipulated to liability. BCS alleged OMS was liable for USMS's wrongful conduct as its successor. In a bench trial, the court found OMS had no successor liability. The parties tried to the jury the remaining issues of damages and UMS's vicarious liability for the stipulating defendants' wrongful conduct. The jury

---

[1]    Man J World, Inc. essentially became USMS. We refer to USMS to mean any iteration of these entities.

[2]    BCS also sued individual defendants David Chang and Suhyun Hyun Hong aka Annie Hong, as well as One Merchant Solutions, LLC dba One Payment Services (OMS). They are not parties to this appeal.

returned a verdict in favor of BCS, awarding it $646,746 on its cause of action for breach of contract, $323,373 on its cause of action for misappropriation of trade secrets, and $107,791 on its cause of action for breach of loyalty. The court, on defendants' motion and over BCS's objection, amended the judgment to limit damages to $646,746, on the ground each cause of action arose from the same conduct.

Defendants collectively challenge the trial court's denial of their nonsuit motion, made at the close of BCS's evidence, arguing BCS presented no evidence to support its claimed damages or that defendants caused those damages. UMS challenges the trial court's denial of nonsuit and JNOV motions it filed contending BCS's single trade secrets claim against it was barred by the applicable three-year statute of limitations. BCS appeals the trial court's ruling on the issue of OMS's successor liability and the amendment of the judgment. We affirm the judgment.

**PROCEDURAL AND FACTUAL BACKGROUND**

The parties' briefs set forth the lengthy procedural history in this case from its initial filing in June 2012 through these appeals. We thus do not include it all here.

1.  *Credit card processing background*

When merchants swipe a customer's credit card, they are charged a processing fee that is split among the credit card issuer (the bank) and the card association (e.g., Mastercard, Visa), the credit card processor, and finally, the Independent Sales Organization (ISO) that provides the merchant with credit card payment processing services. The ISO typically receives one-fifth to one percent of the processing fee charged to the merchant, known as a "residual."

3

An ISO must register with the card association. An ISO can contract with outside, independent sales agents (generally known as "sub-ISOs") to sell its processing services to merchants or hire internal sales agents to sell its services. The card association rules require unregistered sub-ISOs to market and represent themselves in the name of the registered ISO. (Most sub-ISOs are not registered.)

**2.** *The parties*

BCS has been providing credit card payment processing services as a registered ISO since 1987. BCS hires internal sales professionals to solicit merchants to become BCS clients. BCS pays its sales representatives a base salary and a commission based on a percentage of the residual it receives from the merchants the sales agent signed up with BCS.

Patrick Hong, who is Korean, is BCS's founder, president, and CEO. He started BCS to provide bilingual credit card processing services for Korean-speaking merchants in Southern California and then branched out to include Vietnamese- and Chinese-speaking merchants. BCS established a branch office in El Monte specifically to sell its services to ethnic Chinese merchants. BCS now has branch offices throughout the United States.

BCS hired individual defendants Sam Byun in July 2002, Joe Chuang in December 2007, and Andrei Su in January 2009. Byun and Chuang were sales representatives for the El Monte office and Su was a sales representative in the San Francisco office. They each signed contracts with BCS agreeing not to: use or disclose BCS's proprietary information, solicit BCS customers or otherwise cause BCS customers to terminate their business with BCS, or solicit BCS employees.

BCS's confidential proprietary information include its merchant lists and merchant files. The lists and files include the merchant's name and address, the owner's name and phone number, merchant volume, pricing information, charge back data, risk analysis, and BCS's profit margin. BCS's merchant data are protected trade secrets.

Byun and Chuang left BCS and allegedly started USMS (then, Man J World) in April 2011 to sell credit card processing services to ethnic Chinese and Korean merchants in competition with BCS. Su also left BCS and began working for USMS around November 2011. USMS is an unregistered sub-ISO.

UMS is a registered ISO and direct competitor of BCS. Unlike BCS, it contracts with outside sub-ISOs to sell its credit card processing services to merchants and to provide customer service to those merchants. UMS refers to its sub-ISOs as "sales partners." USMS was one of UMS's sub-ISOs or sales partners. UMS pays up to 90 percent of the residual it receives to the sub-ISO that signed up the merchant with UMS.[3]

---

[3] As BCS's industry expert explained, an ISO using an independent sales agent model like UMS pays the bulk of the residual to the sub-ISO that brought in the merchant because the sub-ISO does most of the work and incurs the expenses.

### 3.    *BCS's allegations*[4]

In June 2012, BCS sued the individual defendants, Man J World, and USMS.[5]  BCS alleged Byun and Chuang used BCS's protected trade secret information—including its confidential customer lists and merchant files and applications—gathered during their employment with BCS, to help develop USMS.  In June 2011, Byun also recruited Su while he still was employed at BCS's San Francisco office.  Byun wanted Su to start a branch office for USMS in San Francisco.

BCS allegedly suspected Su was working for a competitor and began monitoring his employee email.  BCS discovered Byun had sent Su an employment application on June 15, 2011.  BCS also discovered that, on November 3, 2011, Byun sent Su a confidential list of several hundred of BCS merchants in San Francisco and a confidential list of over 1,000 of BCS merchants in the El Monte area.  The merchant lists contained the name and address of the merchant, the owner's name and phone number, the business type, credit card processing volume, BCS's profit margin, and other information.  In his email, Byun

---

[4]    We include some general allegations from BCS's later-filed second amended complaint.

[5]    BCS actually named Man J World and US Merchant Solutions, the name under which Man J World then was doing business.  After Man J World began doing business under the name USMS, BCS named USMS in place of a Doe defendant.  For simplicity, we refer to both as USMS.

asked the recipients to print the attached lists and delete the email.[6]

While employed at BCS, Su also sent BCS's confidential information to Byun. On August 5, 2011, Su emailed a merchant application for one of BCS's merchants to Byun. BCS's merchant applications contained "numerous pieces of highly confidential private merchant information," including financial information. In September 2011, Su allegedly left BCS's employ for an extended vacation from which he never returned. He began working "openly" for USMS in November 2011.

BCS alleged defendants used BCS's trade secret merchant lists and confidential information to their advantage and the advantage of BCS's competitors by bringing BCS's merchants to USMS to switch their credit card processing service. BCS asserted causes of action for breach of contract, misappropriation of trade secrets, and three others, based on this conduct. The defendants named in the original complaint answered and asserted affirmative defenses.

### 4.      *BCS's amendments to its complaint*

Discovery took place and BCS learned of other parties to sue. In September 2015, BCS named USMS as a Doe defendant, as well as OMS, with which BCS alleged USMS had merged. In January 2016, BCS also named Chang and Hong, former BCS employees, as Doe defendants.

BCS added UMS as a Doe defendant in February 2016. After UMS moved to quash because it had been more than three

---

[6]      Su had linked his personal email account to his employee email.

years since BCS filed the action (Code Civ. Proc., § 583.210), BCS moved for leave to file a first amended complaint. Among other things, BCS argued it learned during discovery that USMS and OMS were not registered ISOs—as it was led to believe through earlier discovery—but were agents of UMS. BCS sought to add UMS as a defendant under the theory of vicarious liability and argued the three-year statute of limitations governing trade secrets claims was tolled under the discovery rule. The trial court granted the motion over UMS's objection.[7] BCS dismissed the Doe amendment naming UMS and, on August 29, 2016, amended its complaint to name UMS as a defendant and add allegations and causes of action relating to it and the other added Doe defendants. BCS filed a second amended complaint (SAC) on December 14, 2016.

In addition to the allegations above, BCS alleged it learned Chang, a USMS employee, had gotten the El Monte and San Francisco merchant lists from his wife Hong, who was a BCS employee at the time, and given them to Byun. BCS now alleged on information and belief that defendants also misappropriated its national merchant list and shared that list with the defendants in a related action and with UMS.

BCS also now alleged UMS and USMS entered into an ISO-agent agreement under which USMS agreed to register with the card associations and provide UMS with financial and personnel information, but USMS did not do so. BCS alleged

---

[7]     The court also granted Chang's and Hong's motion to quash, but BCS named them as defendants in its amended complaint.

8

on information and belief that, because USMS did not follow the terms of the ISO-agent agreement, USMS, Man J World, and OMS were not sub-ISOs of UMS but were its agents. BCS alleged it had no reason to suspect UMS was the principal of the other entity defendants until it learned this information during Byun's February 2, 2015 deposition. BCS alleged UMS aided and abetted defendants in their misappropriation of BCS's confidential and trade secret information and conversion of BCS's merchant clientele.

BCS now more specifically alleged the individual defendants (including Chang and Hong) solicited the services of UMS to BCS's customers, switched the credit card processing services of dozens of BCS merchants to UMS, used BCS's trade secret information to their and BCS's competitors' advantage, and used BCS's trade secrets as a "primary business building resource" for Man J World, USMS, and OMS. BCS alleged UMS knew the individual defendants had done so and was vicariously liable for their and the other entity defendants' misappropriation of BCS's trade secrets.

The SAC alleged causes of action for: breach of contract against the individuals; misappropriation of trade secrets against the individuals and entities, including OMS and UMS; breach of duty of loyalty against Su; fraudulent transfer against USMS and OMS relating to the alleged merger of the two entities; and aiding and abetting fraudulent transfer against UMS. Defendants answered with a general denial and asserted several affirmative defenses, including the statute of limitations.

**5.** ***Stipulation to liability and bifurcation of action***

Before trial, defendants stipulated to liability as follows: all named individuals stipulated to liability on the first cause

9

of action for breach of contract and, along with USMS, on the second cause of action for misappropriation of trade secrets; Su stipulated to liability on the fifth cause of action for breach of duty of loyalty; and, because USMS essentially had taken over the business of Man J World, they stipulated to liability on the third cause of action for fraudulent transfer.[8]  They agreed judgment against them was "subject only to a determination of damages, if any, caused by them."  OMS and UMS did not stipulate to liability.

The remaining issues to be tried included whether OMS could be held liable as a successor entity of USMS for misappropriation of trade secrets.  The trial court bifurcated that equitable issue.

6.    ***Bench trial on OMS's liability***

The bench trial began on June 18, 2019.  BCS's trial brief argued OMS, which purchased USMS's assets in March 2015, was liable for USMS's torts under the de facto merger doctrine and/or the sham sale doctrine.  Defendants argued the asset purchase agreement demonstrated the transaction between OMS and USMS was not a merger, OMS did not assume any liability USMS may incur from a judgment in this action, and USMS received adequate consideration for its assets.  As a more than one-quarter owner of OMS, USMS, which continued to exist, also had an asset to satisfy any judgment in this case.

For BCS's direct case, BCS's industry expert Paul Rianda testified and counsel read into the record portions of the deposition testimony of Jay Yoon, the CEO of UMS and a

---

[8]     The fraudulent transfer claims ultimately were dismissed.

10

managing member of OMS, Young Soo Lee, CEO of OMS, and Byun.  OMS called as witnesses James Fitzsimmons, a mergers and acquisitions attorney who represented OMS in the transaction, and Yoon.

The admitted documentary evidence included the asset purchase agreement (exhibits 1065 and 2053), OMS's amended and restated operating agreement (exhibit 1106), a March 2015 consulting agreement between OMS and USMS (exhibit 1107), a July 25, 2011 promissory note for $100,000 executed by USMS (exhibit 1068), UMS's consolidated financial statements for December 31, 2016 and 2015 (exhibit 1088) and December 31, 2017 and 2016 (exhibit 1089), and a 2015 USMS/OMS [aka OBS] valuation (exhibit 2054).

The trial court found OMS had no successor liability to USMS.[9]  Judgment was entered in OMS's favor after the completion of the jury trial.

### 7.  *Jury trial on remaining issues*[10]

Jury selection began on June 21, 2019.  The only issues left were whether UMS was vicariously liable for the acts of its alleged agents Chung, Byun, Su, Chang, Hong, and USMS for misappropriation of trade secrets, including its statute of limitations defense; and the amount of damages BCS suffered as result of defendants' wrongful acts.  The court read a

---

[9]    We describe the evidence before the court below.

[10]    We have reviewed the trial testimony and exhibits.  We do not summarize all the testimony, or identify every witness, and have not always described the testimony in the order presented.

11

stipulated summary of the case to the jury explaining defendants' admissions. (During the trial defendants stipulated to joint and several liability.) On June 24, 2019, the parties gave opening statements and BCS called its first witness.

a. *Trial Testimony—BCS's case*

**Patrick Hong**: Hong testified that when he founded BCS, he wanted it to provide full, on demand, bilingual service to the community. BCS served the Korean-speaking market at first and by 2011 had expanded into the Chinese- and Vietnamese-speaking markets. He recalled BCS having opened the Westminster branch for the Vietnamese market somewhere between 2003 and 2005—a few years before the El Monte branch, which BCS opened in 2008 for the Chinese market.

Hong described the time and resources it took to open a branch in a new market—like the El Monte branch. BCS had "to figure out" how many and what types of merchants were in the market, customer demand, and the current pricing, and prepare marketing and customer service material. Hong also testified about the need to create a brand name and to have a good reputation to enable its sales agents to approach and sign merchants. BCS attended, and sometimes sponsored, business association events to make connections, advertise, and build BCS's reputation.

To "procure a merchant," BCS had to hire and train sales agents about BCS's way of doing business and invest a "large amount of money for advertising." It took between two to six months to train someone in customer service or a technician about providing service to the Chinese-speaking community. Hong said BCS had to hire between 15-20 people to get one good

12

sales agent.  He estimated it cost about $30,000 to $40,000 in 2010 to hire one good salesperson.

Hong also explained BCS had to perform underwriting for each merchant it wanted to sign up for its services through a merchant application that included, among other things, financial information and business size and type.  The credit card associations and sponsoring banks would not permit a merchant to process credit card payments unless it met certain financial requirements and risk factors.

From what Hong could recall, in 2011, Westminster had more than 2,000 merchants and El Monte more than 1,000.  By 2016 the Westminster branch had maintained its more than 2,000 merchants, but the number of merchants at the El Monte office had dropped by half, to about 500.

Hong also testified about BCS's delay in naming UMS as a defendant.  He said he learned early on in this case that USMS was using UMS to process its credit card transactions.  BCS didn't name UMS as a defendant until February 2016, however, because during early discovery, USMS and the individual defendants produced an "Independent Sales Organization Bin Sharing Agreement" between UMS and USMS that indicated USMS was a registered ISO (Exhibit 1060).  BCS decided to sue UMS after Hong learned, sometime in late 2015, that USMS "was transferred" to OMS and that Jay Yoon— the president of UMS—was a "partner of this OMS, LLC."

**Jay Yoon**:  BCS learned Exhibit 1060 was not the "actual contract" between UMS and USMS during Yoon's deposition in July 2018 after BCS named UMS as a defendant.  Yoon testified UMS produced the correct agreement, Exhibit 1061, after his deposition.  That agreement, entitled "Independent Sales

13

Organization Agreement," stated USMS was a nonregistered ISO (Exhibit 1061).

BCS's counsel questioned Yoon about the two agreements. Yoon agreed Exhibit 1060 was the form agreement UMS used when contracting with registered sub-ISOS. He confirmed USMS was not registered. He said that, when USMS approached UMS, USMS wanted to register with the card associations, but sometime later—maybe a "few months"—USMS changed its mind. Exhibit 1060—the agreement for registered ISOs—indicates USMS signed it on April 4, 2011. The place for UMS's signature is blank. The operative agreement—Exhibit 1061—however, indicates USMS signed it earlier, on March 29, 2011. UMS's signature line again is blank. Yoon did not know why there were two agreements. He testified UMS sent the agreement to USMS, and USMS signed and dated it.

Yoon agreed its agreement with nonregistered ISOs required the nonregistered ISO to use UMS for its credit card processing. Yoon also agreed nonregistered ISOs must use the name UMS when marketing and selling those services. UMS thus required its unregistered sub-ISOs or "sales partners" to use the UMS logo on all their marketing materials, including business cards and letterhead. Yoon confirmed UMS had lent USMS about $300,000 in total.

**Young Ho Lee**: BCS's director of sales Young Ho Lee testified that in early 2011, the El Monte office had a nine-member sales team, but four sales agents left in March 2011, another left in April 2011, and one more left in October 2011. The sole technician for the office also left. The four salespeople who left in March were the highest performing sales agents in

the El Monte office. The one who left in October was the best one left in the office.

Lee testified he tried to replace the individuals who left, including by putting ads in Chinese newspapers and online sites, but he didn't get many resumes and the people he did hire weren't very good. After March 2012, Lee moved to BCS headquarters to oversee all branch sales teams, but he learned about another seven to eight employees left El Monte between 2012 and 2014. He testified the sales volume at the El Monte office had "decreased significantly."

Lee also testified he learned in October 2011, through Su's emails, that Su had been sending BCS merchants to USMS since May 2011 and was receiving residuals from USMS for doing so. He agreed Su's emails showed BCS merchants being moved to UMS. He confirmed BCS "found out" in October 2011 that Byun and Su "were referring merchants, for payment process[ing] services, to [UMS]."

**Andrei Su**: Su confirmed Byun emailed him in June 2011 asking him to come work for USMS. The email asked Su not to tell anyone. Su admitted he procured certain merchants for BCS in summer 2011 that he then referred to USMS. He sent the merchant's BCS application and underwriting file to Byun. USMS paid Su residuals beginning in July 2011, as well as a cash bonus in August 2011.[11] Su said the merchants asked him to transfer them.

---

[11] Various emails between Su and Byun dated June to November 2011 concerning these events, as well as merchants' applications, emails between Su and merchants, and a

15

Su resigned from BCS in September 2011 to take more than 21 days off work, as BCS policy required, to go to China. His resignation letter stated he would return in October 2011, but he did not. He began working for Byun in November 2011.

Su admitted he received emails from Byun in early November 2011 attaching the BCS El Monte and San Francisco Merchant Lists and telling him to keep a hard copy and delete the email. Su said he did not follow those instructions; he did not pay much attention to the email. He testified he did not open the attached merchant lists.

**Sam Byun**: Byun testified remotely from Korea. He was the Chinese Division Manager at BCS and managed the sales representatives at the El Monte office. He left BCS in January 2011 to provide merchant services through his own company for two different ISOs and then signed an ISO agreement with UMS in March 2011.

Chang sent Byun the BCS El Monte and San Francisco merchant lists around Summer 2011. A few months later, he emailed the lists to Su, Chuang, and Paul Lam (another sales agent). He agreed that, from the information provided on the El Monte merchant list, he could "cherry pick the high value, high profit merchants." He acknowledged that was the reason why he gave the list to Su, Chuang, and Lam. He testified he did not instruct them to do so, however, and denied having an expectation that they would use the list to solicit USMS's services to the high volume, high profit margin merchants.

---

cancellation request, also were admitted into evidence through both plaintiff's and defendants' exhibits.

Byun conceded that, in 2011, six of seven people working for USMS were former BCS employees, although some worked only part-time.

**Joe Chuang**:  Chuang, who speaks Korean, Chinese, and English, began working at BCS in the El Monte office in December 2007.  He left BCS after Byun did and became a co-owner of USMS.  Chuang admitted he brought "some customer[s]" to UMS.  Chuang agreed he used information from BCS's merchant file to transfer the merchant's services to UMS.  He confirmed he had to submit the same type of merchant information with a merchant application for UMS that he had to submit with a BCS application.  Chuang testified specifically about two merchants he had procured for BCS that he transferred to UMS through USMS.  One of them was owned by friends of his father.

Chuang identified a USMS business card with his name on it that states "Sales Partner with United Merchant Services" with "United Merchant Services" reflected in its logo.  Chuang explained the merchant's agreement was with UMS, not USMS.  He understood unregistered sellers of credit card processing services like USMS had to use the name of the processor whose services they were selling.

**Patrick Kennedy**:  Patrick Kennedy was BCS's damages expert.  He assessed the El Monte office's lost profits attributable to defendants' wrongful conduct.  To prepare his opinion, Kennedy reviewed financial information, including profit and loss statements for the El Monte office, other BCS branch offices, and BCS as a whole, as well as information about the overall economics of the credit card processing industry and "what [was] going on" in the industry in the Los Angeles region, as well as

documents filed in the case, including the complaint, and deposition testimony.

In calculating BCS's damages, Kennedy relied on his understanding that: defendants received BCS's trade secret merchant list by email with an instruction to destroy the email and defendants admitted to taking the list; there were instances where USMS actually used BCS's confidential merchant information and merchant applications to provide its own services; Byun solicited Su to work for USMS while Su still was employed at BCS, and a large number of BCS employees left the El Monte branch and ultimately went to USMS; UMS loaned USMS $270,000 to set up its branch; and defendants, except for UMS, had stipulated to liability.

Kennedy testified there thus was "a combination of things . . . that . . . extend[ed] beyond just the . . . merchant list" that enabled defendants to set up a competitor to BCS in the marketplace that influenced his damages calculation. Kennedy concluded defendants' various acts had a negative, lasting impact on sales at the El Monte branch. Based on his review of BCS's financials, Kennedy testified El Monte saw rapid growth from when it first opened in 2008 to 2011, but sales dropped "pretty dramatically" in the years that followed. He explained he thus had to "figure out what [sales El Monte] would've done" had defendants' wrongful conduct not occurred—its "unimpaired" sales—compared to the El Monte actual or "impaired" sales after defendants began competing with it. Second, he had to deduct "variable expenses," such as merchant fees, employee costs, advertising and marketing, travel expenses, printing and postage, supplies, and other expenses to arrive at the El Monte branch's lost profits.

18

Kennedy testified he used the "benchmark approach" to calculate BCS's damages. Kennedy "looked at another BCS branch . . . that was not directly impacted by the . . . wrongful conduct" to compare sales figures. He chose the Westminster branch as a "good comparable" to El Monte because it opened a couple of years before the El Monte branch and primarily targeted Vietnamese-speaking merchants in the Los Angeles area, it had some success and growth over time, and, because both branches were in Los Angeles, they would "be hit by the same things that [affected] the overall L.A. market." Kennedy used Westminster's historic performance as a benchmark to see how El Monte was performing comparatively and how likely it would be to track Westminster over time. He noted that because the Vietnamese market in Westminster was smaller than the Chinese market in El Monte, the Westminster branch's profitability probably understated the El Monte branch's potential, but it provided "a reasonable basis" for his calculation.[12]

---

[12] Kennedy testified he reviewed census data that showed the Vietnamese-speaking population was smaller than the Chinese-speaking population. Hong had testified that, based on the population and types of businesses, the Chinese market was larger than the Vietnamese market. While the Vietnamese market consisted of smaller salons and restaurants, the Chinese market had many businesses, including import businesses. The jury could infer from Hong's testimony that the larger businesses in the Chinese market generated larger transactions and thus more profits than the smaller businesses in the Vietnamese market.

Although El Monte was "pretty substantially outpacing" Westminster, Kennedy assumed that, by the end of 2011, they would be on "equal footing, in terms of overall sales." In other words, "El Monte would track Westminster." Kennedy used a demonstrative chart during his testimony to show the growth of the Westminster office and where El Monte's "unimpaired" sales should have been through April 2019 based on that growth relative to its "impaired," actual sales. Using this benchmark approach, Kennedy calculated the El Monte branch's net lost profits from 2011 through April 2019, after deducting variable expenses, as $4,366,398. To compensate BCS for the reduced value of the business due to the continuing lost profits, Kennedy calculated and added its "terminal value" of $1.6 million (by applying a multiplier of 4 to the last year's lost profits of $400,000) to arrive at a total damages calculation of about $6 million.

Kennedy also gave his opinion about defendants' expert Ben William Sheppard's damages calculation, which was "a lot smaller number." Sheppard calculated El Monte's lost profits based solely on a set of individual merchants who moved from BCS to USMS. Kennedy found that approach "too narrow."

He opined there was a "continuing harm" beyond the set of individual merchants who moved from BCS to USMS. Knowing whom to target and whom not to target in the Chinese market, based on the El Monte list of merchants BCS already had underwritten, and that included the merchants' "underlying activity and profitability," would give anyone a competitive advantage, Kennedy explained. In calculating El Monte's future lost profits, he also considered the effect the loss of key sales personnel had on El Monte's sales, as well as the competitive

20

advantage USMS gained against the El Monte branch by taking BCS's best salespeople, who had personal relationships with merchants in the Chinese market.  In Kennedy's opinion, looking at only the number of merchants who moved from BCS to USMS did not "capture the scope of the impact [of defendants' misconduct] on this business."

On cross-examination, Kennedy agreed the number of merchants who left BCS for USMS was relevant as a piece of the overall harm.  Kennedy believed the list of merchants defendants stated they converted was incomplete and did not capture all merchants who left BCS and went to USMS—whether directly or, after stopping credit card payments, moved to USMS instead of renewing their relationship with BCS.[13]  Kennedy nevertheless agreed that if none of the other facts had occurred, and the issue were only about USMS converting five BCS customers, then he wouldn't be "sitting here today."  Kennedy confirmed a significant part of his damages analysis was based on the number of critical employees who left BCS and could not be replaced.  Kennedy compared the situation to a competitor taking the chief engineers of a software company to set up a competing software company.

b.    *Defendants' motion for nonsuit*

Defendants made a motion for nonsuit at the end of BCS's case in chief.  They argued the evidence BCS had presented was insufficient as a matter of law for the jury to find defendants caused it $6 million in damages.  They asserted BCS only had presented evidence of five or six of its merchants leaving BCS for defendants, which did not support an inference of a $6 million

_____

[13]    See Sheppard testimony, *post*.

21

loss. They also argued the evidence showed BCS knew in 2011 that Byun, Su, and USMS were working with UMS as USMS's processor. Thus the discovery rule had not postponed the running of the statute of limitations and BCS's claim against UMS was time barred. The court denied the motion.

c. *Trial testimony—defendants' case*[14]

**Byun**: Byun testified he found merchants for UMS through his prior knowledge of them. He explained merchants with whom he had a relationship at BCS contacted him after he left and asked to switch to his company. Byun testified he didn't need the BCS merchant lists to sign up merchants and he didn't use BCS's lists before he circulated them in November 2011. Rather, BCS's former merchants signed up with USMS "because they wanted it." Byun acknowledged some former BCS employees signed up merchants with USMS who previously had been with BCS.

**Ben William Sheppard**: Before Sheppard testified, defendants described for the jury the lists of merchants BCS had produced in response to defendants' discovery request that BCS identify its misappropriated trade secrets and merchants. BCS produced a list of about 13,000 merchants from all its offices who had left BCS. From that list, BCS produced a list of about 3,000 merchants from the El Monte and San Francisco offices that had closed their accounts. Defendants compared the list of

---

[14] Defendants also recalled Su and Chuang, called a former BCS employee who went to work for USMS, and called their industry expert.

3,000 merchants to their own list of merchants and highlighted 162 merchants that matched (match list).[15]

Using data from these 162 merchants, Sheppard determined BCS's lost profits based on the transfer of those merchants to USMS were $107,791. Sheppard calculated the profit he would have expected BCS to receive had the matched customers stayed with BCS instead of signing with defendants. Sheppard first determined how many more months a merchant's "life expectancy" would be—the likely number of months the merchant would have remained with BCS based on how long the merchant had been with BCS before it left and considering the average life expectancy was about 36 months. Thus, if the merchant had just signed up with BCS before leaving, Sheppard assumed it would have remained with BCS for a little more than 36 months. On the other hand, if a merchant had been with BCS for, say, 85 months before leaving, Sheppard assumed it would have had another 20 months with BCS.

He then multiplied the annual variable expense margins Kennedy had calculated to the average profits that would have been earned over those months to reach the lost profits attributable to the "expected remaining life" of the identified merchant had it not left BCS. Sheppard walked the jury through the first merchant on his spreadsheet as an example, and calculated its loss represented $775 in lost profits.

Sheppard did not have an opinion on whether defendants' conduct affected the goodwill of the El Monte office. He did

---

[15] During his testimony, Byun agreed 162 of USMS's merchants matched the list BCS provided.

23

not know whether USMS would have been able to set up its competing company without BCS's merchant list nor did he consider the effect losing its key salespeople to USMS had on the El Monte office in calculating its lost profits. He did not consider the impact USMS's competition had on the El Monte office. He considered only the profits the merchants who left for USMS—based on the match list provided to him—would have generated based on a limited life span.

**8.      *Verdict, Judgment, and Amended Judgment***

On the day deliberations began, July 2, 2019, the jury sent the following request: ". . . the exhibits of Patrick Kennedy and Ben W. Sheppard. We need their calculations." After conferring with the parties, the judge responded in writing, "Ben W. Sheppard's calculations are set forth in Ex. 2129. There is no exhibit for Mr. Kennedy. If you so request, Kennedy's testimony can be read back to you." The next morning, the jury sent a second written question:

> "To calculate damages, we need to subtract actual profits from estimated profits (using the gross & net figures for each). We do not have (or cannot find) BCS'[s] actual revenue & expenses for 2010 to 2017/18. We only have some of the data from the BCS business plan (gross revenue of BCS in 2010 from Ex. 1012 & 2011 from Ex. 1013). We don't have (or cannot find) expenses, and would like both from 2010 onward. This is why we asked for Kennedy's slides, but we can use raw data if in evidence."

A little over an hour later, after conferring with counsel, the court returned the following response: "There is no exhibit

24

indicating gross revenues or expenses of BCS. We can have Kennedy's testimony, or any other witness testimony[,] read back to you." The jury entered the courtroom 23 minutes later with its verdict.

By 11 to one, the jury awarded BCS $646,746 against the individual defendants for breach of contract, $107,791 against Su for breach of duty of loyalty, and $323,373 against all defendants for misappropriation of trade secrets. The jury unanimously found USMS did not act as an agent of UMS in misappropriating trade secrets but found in a verdict of nine to three that UMS ratified USMS's misappropriation of trade secrets and thus had the same liability as the other defendants on that cause of action. The verdict form did not include a separate question as to whether BCS's claim against UMS was barred by the statute of limitations.

After the judge signed BCS's proposed judgment, defendants moved to amend it to reflect that BCS "shall recover no more than the total sum of $646,746.00, and to state that [BCS] shall take nothing from Defendant [OMS]." The court agreed with defendants that each of BCS's causes of action "relied on essentially the same factual bases or were included in the broad factual basis underlying the First Cause of Action for Breach of Contract." The court did not sign and file the amended judgment until December 6, 2019.

### 9. Motion for JNOV

UMS moved for JNOV in February 2020 on the ground the three-year statute of limitations barred BCS's recovery against it. Due to COVID-19 restrictions, the hearing on the motion was delayed until August 2020. After taking the matter under submission, the court denied the motion in a written ruling.

25

## DISCUSSION

Defendants contend the trial court erred (1) in denying their motion for nonsuit arguing BCS admitted no evidence from which a jury could find it suffered, or defendants caused, the $6 million in damages its expert calculated; and (2) in denying UMS's motions for nonsuit and JNOV on statute of limitations grounds.  BCS contends the trial court erred in finding OMS was not a successor entity to USMS, and in amending the judgment to limit BCS's recovery.

### 1. *Defendants' appeal*

#### a. *Standard of review*

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.]  'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.  The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." '  [Citation.]  A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.'  [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

We review an order denying a motion for nonsuit de novo, applying the same standard as the trial court.  (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1013.)  This means we will affirm the order so long as substantial evidence supports it.  (*Ibid.*)  Like the trial court, we must

26

evaluate the evidence in the light most favorable to the plaintiff. (*Francis v. City of Los Angeles* (2022) 81 Cal.App.5th 532, 542.) We do not weigh the evidence or consider the credibility of witnesses. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118.) "We also consider evidence introduced after the motion for nonsuit by any party in evaluating whether there is substantial evidence in the record that could support a judgment in plaintiff's favor." (*Francis*, at p. 542.)

On a motion of a party against whom a verdict has been rendered, the court must "render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted." (Code Civ. Proc., § 629, subd. (a).) As with an order denying a motion for nonsuit, " '[an] appeal from the trial court's denial of [a] motion for [JNOV] is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision.' " (*Paulus v. Crane Co.* (2014) 224 Cal.App.4th 1357, 1362.) "[O]ur standard of review—as was the trial court's standard on the motion—is 'whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion.' " (*Morgan v. J-M Manufacturing Company, Inc.* (2021) 60 Cal.App.5th 1078, 1085.) And, we determine "the presence of the requisite substantial evidence" de novo. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639.) We view the evidence in the light most favorable to the jury's verdict, disregard conflicting evidence, and draw all reasonable inferences in favor of the verdict. (*Morgan*, at p. 1085.)

b.    *Damages*

We first address BCS's argument that it was not required to prove causation because, except for UMS, defendants

27

stipulated to liability, including causation. Although defendants stipulated to liability, they did not stipulate that their wrongful conduct *caused the damages plaintiff sought*. The stipulation expressly states defendants "stipulate to liability to BCS – making judgment against them subject only to a determination of damages, if any, *caused by them*." (Italics added.) In other words, defendants did not admit to causing the specific damages BCS claimed. (*See Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 453, cited in defendants' stipulation to liability [defendant who admitted to liability admitted to causing harm but not to causing "the specific damages [the plaintiff] claimed"]; *Vogt v. McLaughlin* (1959) 172 Cal.App.2d 498, 502 [holding "a defense verdict may be returned even where liability is admitted, if the evidence would sustain a conclusion that plaintiff's injuries were not proximately caused by the . . . event sued upon"].) We also agree with defendants that they did not admit to causing BCS's claimed damages by unsuccessfully moving in limine to preclude evidence of their liability.

The court also instructed the jury as to what defendants admitted, and to what they did not, and what BCS had to prove for each cause of action.[16] The jury was instructed that, to prevail on its claims, BCS had to prove it was harmed and the individual defendants' breaches of contract, Su's breach of loyalty, and defendants' misappropriation of trade secrets were "a substantial factor in causing [BCS's] harm." The court instructed the jury that a "substantial factor" is "a factor that

---

[16] The parties do not challenge the propriety of the jury instructions.

28

a reasonable person would consider to have contributed to the harm." While it "must be more than a remote or trivial factor[,] [i]t does not have to be the only cause of the harm."

BCS's theory, articulated by Kennedy, was that BCS's harm went beyond the lost profits attributable to the merchants who switched from BCS to USMS. Rather, defendants' misconduct enabled USMS to start up a competing business in the Chinese market that was better able to compete by using BCS's trade secrets and confidential information and by taking BCS's best salespeople who already had established relationships in the market. Thus, in addition to losing profits from the merchants USMS "poached," BCS lost current and prospective customers because USMS essentially was able to gain a competitive advantage over BCS, that it otherwise would not have had, through defendants' misconduct. Because BCS's merchant lists and related information included the merchants' sales volume and profitability, USMS could establish itself quickly in the Chinese market by directing its efforts toward the most profitable merchants without having to spend time and resources to learn which merchants to target. BCS's loss of its key salespeople to USMS also affected its ability to keep its current customers and sign up new ones, resulting in a decline in the office's productivity, which in turn would make it harder to attract business.

As they did in their motion for nonsuit, defendants argue BCS presented evidence of only five El Monte merchants, and one San Francisco merchant, having left BCS for defendants, and offered no evidence in its case from which the jury could find BCS suffered $6 million in lost profits caused by defendants. Yet, when a "motion for nonsuit is made and denied and the

29

defendant then proceeds with his case, if the judgment thereafter entered is supported by substantial evidence, regardless of which party produced the evidence, the order denying the motion for nonsuit will not be disturbed on appeal." (*Huber Tool Works, Inc. v. Marchant Calculators, Inc.* (1962) 204 Cal.App.2d 822, 824.) We thus "review the sufficiency of the evidence to support the jury's verdict, not the sufficiency of the evidence at the time of the nonsuit motion." (*Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 613, citing *Lowe v. San Francisco & N.W. Ry. Co.* (1908) 154 Cal. 573, 575–576.); see also *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833–834 ["it has long been established that error in overruling a demurrer, or denying a motion for nonsuit, cannot be relied on to overturn a judgment where the matter proceeded to trial and the evidence supports the ultimate result"].) We conclude substantial evidence supports BCS's theory of damages and the amount the jury awarded.

i.     Substantial evidence supports finding defendants caused BCS to lose business

First, substantial evidence supports a finding that defendants' wrongful conduct—the misappropriation of BCS's trade secret merchant information, solicitation of BCS's merchants (and Su's providing their information to USMS), and solicitation of BCS employees—was a substantial factor in El Monte losing current and future business.

The jury could infer from Hong's testimony that BCS spent a great deal of time, effort, and resources to determine what merchants to target in the Chinese-speaking market and in developing those relationships. It thus reasonably could find USMS's ability to enter the market without having to do the legwork to determine which merchants to target—because it

30

had BCS's protected merchant information—and without having to train salespeople—because it took BCS's best sales agents—would have made it much easier for USMS to compete with BCS. Although defendants' damages expert Sheppard did not know whether USMS could have set up a competing business without BCS's protected merchant information, he agreed USMS's use of the El Monte merchant list "may have" given USMS a "head start" with its sales in the Chinese market. And, Hong testified UMS—the actual provider of the credit card processing services—did not begin competing with it in the Chinese market until doing so through USMS. Moreover, Byun agreed he gave the BCS merchant lists to Su, Chuang, and Lam—all former BCS employees—so they could "cherry pick the high value, high profit merchants." We can infer the jury found not credible Byun's denial of using the list or expecting Su, Chung, and Lam to use it to solicit USMS's services, and that USMS in fact did so.

The evidence showed that merchants who had been receiving services from BCS through the El Monte office (and San Francisco), or had applied to receive services, left and became customers of USMS. Su, Byun, and Chuang all admitted to switching BCS's merchants to the services USMS sold. Su admitted he referred merchants, and sent their BCS application, and other confidential information, to USMS (and was paid for those referrals) both while he still worked at BCS and after he resigned. Byun also admitted to switching merchants with whom he had had a relationship while at BCS to his company after he left. Chuang testified about switching two BCS merchants after he joined USMS. And Byun confirmed 162 merchants from USMS's list of merchants matched the list of merchants who had left BCS's El Monte and San Francisco

31

offices.  Viewing the totality of the evidence in the light most favorable to the verdict, the jury reasonably could infer the merchants who left BCS and signed up for services through USMS would not otherwise have left.

Moreover, although the jury instructions stated Chuang and Byun admitted only to soliciting Su, substantial evidence supports the inference that they and Su solicited BCS's other key sales employees.[17]  Byun conceded six of seven people working for USMS in 2011—the year USMS began competing with BCS by selling UMS's services—were former BCS employees.  There was conflicting testimony about the reasons for employees leaving the El Monte office, such as a decline in morale after Byun and Chuang left, the arrest of an employee for embezzlement, and animosity between Korean and Chinese employees, but we can infer the jury disregarded any conflicting evidence.

And, when evaluating the evidence in the light most favorable to BCS, the jury reasonably could conclude defendants' solicitation of key BCS salespeople substantially contributed to BCS's lost profits.  As Hong testified, BCS's reputation and goodwill were important to its ability to sign merchants.  The jury could infer the exodus of BCS's key salespeople, along with the loss of merchants to USMS, harmed BCS's reputation making it more difficult for its less capable salespeople to sign new merchants.  The jury also could infer from Hong's testimony

---

[17]     The parties stipulated that, in addition to Su, BCS claimed defendants solicited six or so other employees.  Due to the rough draft nature of the reporter's transcript, we are unable to tell exactly.

that the loss of personnel and decline in the El Monte office made it harder for BCS to provide the type of on-demand service its customers were used to, leading to more merchants leaving. For example, Su spoke Mandarin enabling him to help Chinese-speaking merchants on demand at all hours. After Su left BCS to join USMS, no one left at BCS spoke Mandarin.

We also can infer the jury found Lee's mitigation testimony credible: that BCS was unable to replace the sales agents it lost with salespeople of the same caliber despite its efforts. There is evidence in the record that BCS did not want to hire experienced sales agents. But the jury could infer it might be harder for BCS to teach an individual BCS's way of doing business if that individual had a different prior experience. Moreover, Lee testified BCS attempted to hire salespeople "capable of performing sales duties," but did not require a background in the industry, as BCS trained them.

Based on the evidence, the jury thus reasonably could find the drop in sales revenue, and thus profits, at the El Monte office—when compared with the growth in the Westminster office during the same period—was attributable to defendants' wrongful conduct. Kennedy's chart and the profit and loss statements he reviewed were not in evidence. But BCS's business plans for years 2009 through 2014 and sales goals summaries for years 2015 through 2018 were. They included sales data for both El Monte and Westminster.[18] Those

---

[18] Kennedy testified he looked at BCS's actual projections in its business plans for 2008-2014 as a data point in determining his loss calculation.

data confirm Kennedy's testimony that: both El Monte and Westminster were growing, with El Monte growing at a greater rate than Westminster; El Monte's merchant numbers and gross revenues dropped significantly after USMS began competing with it; and Westminster did not experience the same decline but continued to increase its gross revenues.

And, after El Monte's sales dropped, the business plans show it continued to have much lower sales revenues than the Westminster branch. For example, El Monte had $3,127,616 in gross revenues in 2012, $2,834,184 in 2013, and $2,892,268 in 2014 versus $6,727,251, $6,774,412, and $7,572,830 for Westminster for those same years, respectively. Hong also testified the number of merchants at Westminster remained about the same between 2011 and 2016, but the number of merchants for El Monte almost halved.[19]

Based on the totality of the evidence, the jury reasonably could infer that, had defendants not engaged in wrongful conduct, the El Monte branch not only would have retained the merchants Sheppard identified in his analysis, but also would have lost fewer merchants and continued to grow and gain new merchants at a greater rate. The cases on which defendants rely are thus distinguishable.[20]

---

[19] The BCS 2017 sales goal summary indicates El Monte had 583 live accounts in 2016 and Westminster had 2,070.

[20] See, e.g., *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628 (nonsuit on cross-claim proper where defendant's recovery of restitution required it to show the degree to which plaintiff was enriched by retaining and using defendant's proprietary information but defendant presented

ii.     Substantial evidence supports the award

As Kennedy's calculation and data on which he relied were not in evidence, we agree the jury could not reasonably find BCS was entitled to $6 million in lost profits.  (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 665, 686, relied on by defendants [expert may rely on hearsay in forming opinion and tell jury he did so but cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception"].)[21] That does not mean, however, there was insufficient evidence to support the jury's award of, at its highest number, $646,746 in lost profits.  " 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.]  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.

no such evidence); *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 977 (damages for contractor's lost profits on future bids it would not get due to school district having impaired its bonding by terminating their construction contract were not recoverable as general damages as benefit of bargain was profit on district's contract, and future losses were not foreseeable to constitute special damages).

[21]     In *Sanchez*, however, the high court found the trial court's admission of the expert's testimony was a prejudicial confrontation clause error where the expert relied on hearsay statements in a police report to establish defendant was a gang member for purposes of proving a street gang enhancement. (*Sanchez*, at pp. 698–699.)

35

[Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774–775 (*Sargon*).) Here, as we have concluded, substantial evidence supports the fact of damages and that BCS's lost profits could be attributed to defendants' wrongful conduct. As we discuss, substantial evidence also supports the amount awarded.

Sheppard testified that, if he attributed defendants' wrongful conduct as the reason the 162 merchants on defendants' match list left BCS, BCS's lost profits would be about $107,791.[22] Based on the evidence, however, the jury reasonably could infer there were more than 162 merchants that left BCS and joined USMS. Kennedy noted defendants had not verified the accuracy of the match list. He explained that, if the same merchant were listed slightly differently in the two lists, then a match would not result. He thus believed the list did not capture all BCS merchants who transferred to USMS.

---

[22] Of that amount, $7,358 related to merchants who left the San Francisco office. Kennedy did not calculate any damages based on lost profits from the San Francisco office because that office recovered. Nevertheless, BCS still was harmed by the loss of profits from merchants switching from the San Francisco office to USMS. In any event, the sales data relating to the El Monte and Westminster offices in BCS's business plans support the amount of the verdict.

36

Other evidence supported Kennedy's testimony. Su confirmed defendants' exhibit 2056, that listed the merchants he had serviced at BCS who moved to USMS, was incomplete. BCS also presented a rebuttal witness, Jake Sung, who worked at USMS (or OMS) with Byun for a few months in 2015 after having worked at BCS. Sung testified he converted 45 merchants he had managed while at BCS to "Sam's Company," but Byun didn't ask him to do so. Lee testified twenty percent of those merchants (nine) did not appear on defendants' match list. In any event, again, the jury reasonably could find BCS's lost profits were not limited to those attributable to merchants leaving BCS for USMS.

" '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' [Citation.] 'Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 774.)

That's what happened here. The testimony showed the El Monte office already was established when defendants engaged in their wrongful conduct, and the Westminster office provided a " 'similar business[ ] operating under similar conditions,' " from which the jury could ascertain El Monte's lost profits. BCS's business plans and sales goals summaries include actual sales data for both El Monte and Westminster. As indicated in its question to the court, the jury was aware of the BCS business plans that were in evidence. Based on our review, the data in the admitted exhibits more than support the jury's damages award.

That the jury used multiples of Sheppard's calculation—rather than engage in a more complicated math exercise—is of no matter. We infer from the evidence that the jury agreed with BCS's theory of the case, and the evidence—drawing all favorable inferences from it—reasonably supports its damages award.

c.     *Substantial evidence supports the jury's implied finding that BCS timely filed its claim against UMS*

i.     Applicable law

A plaintiff claiming misappropriation of trade secrets must sue "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." (Civ. Code, § 3426.6.) " 'A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements." [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period.' " (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 586 (*Cypress*).) A "plaintiff may discover, or have reason to

38

discover, the cause of action even if he does not suspect, or have reason to suspect, the identity of the defendant. [Citation.] That is because the identity of the defendant is not an element of any cause of action. [Citation.] It follows that failure to discover, or have reason to discover, the identity of the defendant does not postpone the accrual of a cause of action." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 399 (*Norgart*); see also *Cypress*, at p. 587.) And, in a trade secrets case, "the statute of limitations . . . begins to run when the *plaintiff* has any reason to suspect that the third party knows or reasonably should know that the information is a trade secret." (*Cypress*, at p. 579.)

ii.     Analysis

The trial court denied UMS's motion for JNOV, finding BCS's knowledge that UMS provided credit card processing services to the other defendants "on its own is not [a] sufficient basis for the court to conclude as a matter of law that BCS had reason to suspect UMS had committed the wrongdoing alleged." The court found Hong's and Lee's testimony "provide[d] sufficient basis for the trier of fact to conclude that BCS lacked reason to discover its cause of action against UMS until much later in the litigation." The court also noted the jury found UMS liable based on its ratification of the misappropriation of trade secrets. It found the trial testimony provided substantial evidence for the jury to find BCS lacked notice of a relationship between UMS and the other defendants—until later—that would give rise to a cause of action against UMS based on ratification.

UMS contends the court erred because, under *Norgart*, BCS's filing of its trade secrets misappropriation cause of action against the individual defendants and USMS in June 2012 established BCS knew it had a trade secret misappropriation

39

claim against someone, even if it had not yet discovered UMS was the wrongdoer. BCS thus had, at most, only until June 2015 to name UMS as a defendant.

BCS contends that, until it learned "USMS had merged with OMS, it did not know that UMS was involved in the misappropriation of BCS's trade secrets. BCS's initial mistaken belief that UMS could not be liable in the misappropriation of trade secrets in this action was due to the misleading ISO [a]greement produced by [d]efendants." As it did below, BCS argues that, because a registered ISO is an independent company, if USMS were registered, it would be responsible for its own actions and liabilities, and UMS could not be held liable for USMS's torts. Thus, BCS argues, it was not until Hong's discovery in September 2015—that Yoon was directly involved in OMS—that BCS suspected UMS and Yoon "orchestrated and ratified" USMS's and the individual defendants' misappropriation of BCS's trade secrets.[23]

The jury heard the testimony of Rianda, BCS's industry expert, before Hong's. Rianda testified that, as a registered ISO,

---

[23] UMS argues Hong decided to sue UMS when he learned Exhibit 1061 governed the UMS-USMS relationship. UMS argues Hong could not have decided to sue UMS based on having seen the correct agreement because UMS did not produce it until after BCS named UMS. UMS focuses on Hong's testimony that, he wasn't "certain," but thought he learned Exhibit 1061 was the operative agreement " 'sometime in 2015.' " He testified earlier, however, that he decided to name UMS after learning about the USMS-OMS transaction. The jury thus reasonably could find Hong simply was mistaken on the date when he learned about Exhibit 1061.

USMS would own its residuals and be able to market its services under its own name, as an independent company. A nonregistered ISO, on the other hand, can advertise and operate only in the name of a registered ISO, such as UMS and BCS; it cannot have its own brand. Thus, BCS argues, although it knew UMS was processing credit card payments for merchants procured through USMS, defendants misled BCS to believe— through their production during discovery of the ISO agreement (Exhibit 1060)—UMS could not be liable for USMS's or its agents' torts as a matter of law. It is undisputed USMS never registered with the card associations, as Exhibit 1060 required.

True, accrual of a cause of action "does not wait 'until a plaintiff is in a position to present evidence which will (regardless of what evidence the defense musters) establish facts which make liability a legal certainty.' " (*Cypress, supra*, 163 Cal.App.4th at p. 585.) Here, however, the evidence shows BCS was not simply waiting to shore up its case against UMS. BCS did not seek to hold UMS liable for its *own* misappropriation of BCS's trade secrets but for that of the other defendants. "Ratification is the subsequent adoption by one person of an act which another without authority assumed to do as his agent." (*Anderson v. Fay Improvement Co.* (1955) 134 Cal.App.2d 738, 748.) As the trial court noted in its written ruling, " 'since ratification contemplates an act by one person [o]n behalf of another, there must exist at the time the unauthorized act was done a relationship, either actual or assumed, of principal and agent, between the person alleged to have ratified and the person by whom the unauthorized act was done.' " (*Ibid.*)

Defendants' production of the wrong ISO agreement demonstrated to BCS that UMS and USMS did not have an

41

agency relationship, nor a purported or assumed one, that could provide a legal basis to hold UMS vicariously liable for USMS's torts. *Norgart* is thus distinguishable. There, parents sued defendant drug manufacturer for the wrongful death of their daughter, who killed herself by overdosing on the defendant's prescription drug, outside the statute of limitations based on the discovery rule. (*Norgart, supra*, 21 Cal.4th at pp. 389–390.) Parents alleged the defendant concealed its drug's dangerous propensities. (*Id.* at p. 390.) The Court concluded parents' claim was untimely as they had reason to suspect the drug company of wrongdoing on or shortly after their daughter's death: they had learned of her depression and suicide by overdose of defendant's drug, the drug's packaging warned symptoms of depression could be intensified, leading to suicidal tendencies, and the father suspected " 'something wrong' had happened to" his daughter to cause her to take her own life. (*Id.* at pp. 405–407.)

UMS also argues BCS had reason to suspect UMS as early as October 2011 when it discovered Su's emails and at least by June 2012 when it filed its lawsuit. UMS relies on *MGA Entertainment, Inc. v. Mattel, Inc.* (2019) 41 Cal.App.5th 554. There, MGA contended the discovery rule applied to its counterclaim for trade secrets misappropriation against Mattel because, had Mattel provided truthful discovery responses, the answers would have revealed its taking of MGA's trade secrets. (*Id.* at p. 558.) MGA did not file its counterclaim until after the limitations period when it discovered Mattel's misappropriation through a former employee's deposition. (*Ibid.*) The court held MGA's earlier filing of an unclean hands defense in response to Mattel's complaint demonstrated MGA already suspected misappropriation. Mattel's efforts to conceal its wrongdoing

42

thus did not toll the statute of limitations. (*Id.* at pp. 557–558, 564–565.)

Here, in contrast, the evidence does not show as a matter of law that BCS had reason to suspect UMS of wrongdoing by 2011 or 2012. UMS argues BCS had evidence "UMS knew it was receiving former BCS merchants from former BCS salesmen using BCS trade secrets" when it discovered Su's emails "disclosing its claimed secrets to UMS." Those emails, however, show Su disclosed BCS's trade secret information to USMS, not UMS. For example, Su sent Byun the trade secret application and attachments for BCS merchants, and the UMS applications the merchants had signed to switch services, but the emails do not reflect Su or Byun forwarded the trade secret BCS applications to UMS. There also are emails between UMS and Byun about resolving a hold on a merchant's account and one about providing documentation to verify a charge a merchant had made. These too do not show anyone at USMS sent UMS BCS's confidential merchant information. In any event, the jury reasonably could find the email messages did not provide a basis for BCS to suspect UMS knew USMS and the individual defendants had used BCS's trade secrets. For the same reasons, that evidence does not establish as a matter of law that BCS had reason to suspect UMS was directing or ratifying the other defendants' misappropriation of BCS's trade secrets.

UMS contends that, because BCS knew its trade secrets had been misappropriated and used to switch its merchants to UMS's services, BCS's claim against UMS accrued at the latest when it sued the other defendants in June 2012, even if BCS was unaware of UMS's " 'role' vis-à-vis the other [d]efendants" before then. UMS relies on *Vaca v. Wachovia Mortgage Corp.* (2011)

43

198 Cal.App.4th 737, 744, for the proposition that once a plaintiff learns of "facts sufficient to apprise [the plaintiff] of [the plaintiff's] injury," the limitations period starts to run "even if plaintiff was ignorant of defendants' role in" the cause of action. There, the plaintiff's husband had procured fraudulent mortgage loans in their minor children's names. (*Id*. at pp. 740–741.) The plaintiff sued defendants—the mortgagees—more than three years after she sued the husband and more than a year after the husband told her defendants' representatives knowingly allowed him to obtain the fraudulent mortgage loans. (*Id*. at pp. 740–742, 744.) The plaintiff argued her suit was not untimely as she did not know of their knowing participation in the fraud until then. The appellate court held her causes of action accrued when she sued her husband for fraud—by then she suspected someone had wronged her children and "knew the details of the fraudulent transactions well enough to allege the underlying facts—including the mortgages obtained from defendants—in her fraud complaint." (*Id*. at pp. 743–744.) And, even if defendants' identities had been fraudulently concealed, the plaintiff had learned of their identities in time to assert timely causes of action against them but failed to do so. (*Id*. at p. 741.)

Here, the jury reasonably could find the emails discovered in October 2011 did not show UMS was involved in the other defendants' trade secrets misappropriation in some yet-to-be-discovered way to start the accrual of BCS's cause of action against UMS. In *Vaca*, in contrast, the plaintiff knew about the fraudulent mortgages, even if she didn't yet know the mortgagees' role in the fraud.

44

Finally, UMS argues 2011 billing statements BCS filed in support of its posttrial motion for attorney fees that show its attorneys researched UMS's " 'sales structure' " and prepared an opinion letter about "reponde[a]t superior" imply BCS had sufficient notice of its claim against UMS for its cause of action to have accrued when it filed this action in June 2012. We disagree. The fact its attorneys researched UMS's potential liability, but did not name it as a defendant, equally implies BCS's attorneys did not have a good faith basis in law or fact to name UMS at that time.

Accordingly, substantial evidence supports the jury's implied finding BCS had no reason to know UMS was involved in the misappropriation of BCS's trade secrets before September 2015 when it learned Yoon was a part owner in OMS.

**2.    *BCS's appeal***

        a.      *Standards of review*

The issue of whether to impose liability on a successor company is an equitable one for the trial court to decide. (*Rosales v. Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187, 196.) We review the trial court's equitable determinations for abuse of discretion. (*Ho v. Hsieh* (2010) 181 Cal.App.4th 337, 345.) A court's decision to modify a judgment also is left to the trial court's discretion. (See, e.g., *Wolf Metals Inc. v. Rand Pacific Sales Inc.* (2016) 4 Cal.App.5th 698, 703 [discretion to modify judgment to add judgment debtor].)

        " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' " (*Sargon, supra*, 55 Cal.4th at p. 773.)

" ' "[W]e will only interfere with [the trial court's] ruling if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge reasonably could have reached the challenged result." ' " (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)  To the extent the trial court's exercise of discretion relies on factual findings, we review those findings for substantial evidence.  (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.)  In doing so, we "accept all evidence supporting the trial court's order[,] . . . completely disregard contrary evidence[,] . . . [and] draw all reasonable inferences to affirm the trial court."  (*Ibid.*)

   b. *OMS successor liability*

  "Upon merger . . . the separate existence of the disappearing corporations ceases and the surviving corporation . . . shall be subject to all the debts and liabilities [of the merged corporation] . . . as if the surviving corporation had itself incurred them."  (Corp. Code, § 1107, subd. (a).)  As a " 'general rule . . . where a corporation purchases, or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities.' " (*Daniell v. Riverside Partners I, L.P.* (2012) 206 Cal.App.4th 1292, 1300.)  An asset purchaser does assume the seller's liabilities, however, when " '(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.' " (*Id.* at pp. 1300–1301, quoting *Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28.)

46

BCS argued below, and on appeal, that OMS is subject to successor liability under the second exception, because the OMS-USMS transaction was a "de facto merger," and the third exception, which it refers to as a " 'sham sale.' "  The trial court's ruling does not specify its basis, and the parties did not request a statement of decision.  We thus "infer the trial court made all factual findings necessary to support the judgment." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) The only issue is whether substantial evidence supports those implied findings.  (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 793.)

i.  Evidence presented at bench trial

OMS was formed in December 2012 and is a subsidiary of UMS, which is its majority member.[24]  OMS was a sub-ISO of UMS.  Yoon had about an 80 percent ownership interest in UMS.

*The purchase of USMS's assets*

Yoon's deposition and live testimony conflicted with Lee's deposition testimony as to who first had the idea of bringing OMS and USMS together.  Yoon said it was Lee and Byun, and Lee said it was Yoon.  Yoon estimated it took more than a year but less than three years from the time the idea first came up until the transaction closed.

OMS and USMS entered into an asset purchase agreement effective March 27, 2015.  UMS was the third-party beneficiary

---

[24]  In 2013, UMS had a 95 percent ownership interest in OMS and Lee (OMS's CEO) a five percent interest.  After the purchase, UMS's and Lee's interests were 70.35 and three percent, respectively, and USMS acquired a 26.65 percent interest.

of the agreement. Fitzsimmons drafted the agreement on behalf of OMS. He represented OMS, through Yoon, but UMS paid his legal fees. Yoon was the manager at OMS, and Fitzsimmons understood he essentially controlled OMS by virtue of UMS's ownership interest in OMS. He knew of no conflict between UMS and OMS. USMS was not represented. Byun acted on behalf of USMS. Fitzsimmons negotiated with him by phone.

Fitzsimmons denied the transaction was a merger. Fitzsimmons explained that, in a merger, the acquiring party effectively acquires the stock of another company and with it, all the company's assets and liabilities. In an asset purchase transaction, the purchaser acquires and assumes, respectively, specifically identified assets and liabilities. That was the objective of the asset purchase agreement between OMS and USMS. Fitzsimmons recalled OMS set out to acquire the residual streams from USMS's merchant accounts.

BCS's industry expert Rianda testified a "merchant residual stream" or "residuals"—the monthly revenue paid based on the credit card processing of merchants associated with a particular ISO—is the "only really valuable asset" of a sub-ISO, such as USMS. When a party purchases a portfolio of merchants that make up a particular residual stream, the portfolio is often called a " 'static portfolio' " because no new merchants are added to it. Yoon confirmed the USMS residual stream OMS purchased was a "static revenue stream."

Fitzsimmons testified the parties determined the value of the transaction and the nature of the consideration they wanted—an equity interest in OMS—and gave him that information, which he implemented in section 1.5 of the agreement. The consideration included the issuance of 266,500

Class B common units in OMS to USMS, having an agreed value of $544,696 and representing 26.65 percent of the currently issued and outstanding equity interest in OMS. An additional mechanism existed that provided for the issuance and vesting of Class C stock to USMS based on the number of merchants it brought over to OMS. Fitzsimmons discussed with Byun the structuring of the consideration.

The agreement also set forth the specific liabilities OMS agreed to assume, which included USMS's obligations on four promissory notes it had issued to UMS. One note had a principal of $100,000 and the three other notes had a total balance of $152,244 in principal and interest remaining as of December 22, 2014. No other liabilities were assumed.

Fitzsimmons knew, through Yoon or Byun, about the current lawsuit at the time of the transaction and expressly excluded it from the assumed liabilities. Section 1.4 of the asset purchase agreement expressly states that, "[o]ther than the Assumed Liabilities [defined as the balance in principal and interest on the promissory notes], [OMS] assumes no debts, liabilities or obligations of [USMS] of any kind or nature whatsoever . . . and [OMS] shall not be responsible for any obligations, liabilities, indebtedness, debts, liens, security interests or encumbrances of [USMS] in any way associated with the operation of the Business prior to the Closing Date."

As a condition to closing the deal, the parties also were to enter an amended and restated operating agreement for OMS. That agreement required UMS to make a capital contribution into OMS of "up to" $1,348,925. OMS's entry into a three-year consulting agreement with USMS that paid USMS $96,000

a year for its management services also was a condition of the transaction.

Yoon testified about how the parties arrived at the $544,696 "purchase price," in OMS equity, for USMS's assets. He testified that, in the payment processing industry, it is common to apply a multiplier of 10 to 30 percent to the residual stream to determine the value of a merchant portfolio.[25] Yoon used a high multiplier of 30 times the monthly residual to value the USMS residual stream OMS would acquire.

Exhibit 2054 reflects the formula used to value USMS's merchant portfolio. It listed the monthly residuals UMS paid to USMS and OMS as its sub-ISOs. By multiplying the average of the last 12 months' residuals by 2.5 (which is 30 times one month), the calculation valued USMS's residual stream at $796,940. Yoon testified that because USMS still owed UMS money from outstanding loans—the promissory note obligations OMS assumed in the asset purchase agreement—they deducted that debt from the value. Exhibit 2054 reflects the deduction of USMS's loan balance of $252,244 from the $796,940 asset value to arrive at an asset value of $544,696. Yoon gave Fitzsimmons that number, which represented 26.65 percent of the OMS issued equity.

In his deposition, Yoon testified he understood the loan amounts USMS still owed UMS were taken into consideration in the purchase price so that USMS owed no more debt. A loan

---

[25] Rianda also understood a purchaser would apply a multiplier to the monthly residual amount in arriving at a purchase price.

was in default at the time of the asset purchase. Yoon said no cash went to USMS for the purchase. Instead UMS "inject[ed a] million dollars" into OMS. He was sure USMS's outstanding loan amount was part of the $1 million. Exhibit 2054 also shows a $1 million investment by UMS into the new OMS entity.

*Post-purchase evidence*

Because OMS is a subsidiary of UMS, UMS's consolidated financial statements include the OMS-USMS transaction. The December 31, 2016 and 2015 statement includes a note indicating the acquisition cost of USMS was $629,230, but the asset value was $796,940 resulting in "a gain on bargain purchase" for the year ending December 31, 2015. The note includes a paragraph that states,

> "The Company believes that it was able to acquire USMS for less than the fair value of its asset because of the Company's unique position as a market leader in this industry segment, and the Company's long standing relationship with USMS as an . . . ISO . . . of the Company receiving operational and financial support from the Company since 2011. In addition, the Company was able to agree on a favorable purchase price in consideration for the continued employment of the workforce of USMS."

The December 31, 2017 and 2016 statement includes this same paragraph in its notes. Yoon testified the comment was the auditor's comment, so he couldn't say if it was correct or not. USMS might not agree with it.

51

Another note in the 2017 statement reflects, according to Rianda's understanding of it, the value of USMS's merchant portfolio in 2017 as $1,221,940, up from $796,940 in 2016. Rianda testified he had never seen a residual stream increase by almost 50 percent over a three-year period. Because merchants usually have a three-year contract, and leave or go out of business as time goes on, Rianda opined a static portfolio residual typically would go down over time.

Lee testified in his deposition that Su, Chuang, Byun, and the other employees at USMS began working at OMS; USMS's phone line was forwarded to OMS or a new line was opened; and USMS merchants became OMS merchants. Lee said Yoon decided on OMS as the surviving company.

Byun testified in his deposition that USMS "is no longer around." As of March 2015, USMS had operated as One Payment Services, but to prevent confusion, USMS hadn't notified merchants of that fact. Byun said he owned approximately 20 percent of OMS and Chuang seven to eight percent. Byun's business card identifies him as " 'president,' " but he understands Lee is the CEO, CFO, and secretary, Chuang is the sole " 'sales vice president,' " and Su holds the title " 'sales manager.' "

ii.     Substantial evidence supports the implied finding of no de facto merger

BCS argues, as it did below, that OMS's purchase of USMS was a "de facto merger." Courts evaluate five factors to determine whether an asset purchase is "the legal equivalent of a merger: '(1) was the consideration paid for the assets solely stock of the purchaser of its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become the shareholders of the

purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller?' " (*Franklin v. USX Corp.* (2001) 87 Cal.App.4th 615, 626 (*Franklin*), quoting *Marks v. Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429, 1436.) "The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets." (*Franklin,* at p. 625.)

"[A]lthough other factors are relevant," what "*must* be present in order to avoid the general rule of successor nonliability, is the payment of inadequate consideration." (*Franklin, supra*, 87 Cal.App.4th at p. 627, italics added.) Accordingly, as defendants note, if sufficient evidence exists for the trial court to have found USMS received adequate consideration for its assets, we need not consider the other factors to affirm the court's implied finding that there was no de facto merger.

Substantial evidence supports the trial court's implied finding that adequate consideration was paid. True, OMS did not pay cash for USMS's assets—the asset purchase agreement provided for USMS to receive an equity interest in OMS worth $544,696. The evidence showed, however, that OMS did not pay for USMS's assets "solely" in OMS equity, as BCS asserts.

Rather, the evidence showed the parties adequately valued USMS's asset—its monthly residual income stream—at $796,940 by applying a high multiplier of 30. The trial court reasonably could find that amount did not undervalue USMS's assets. Both Yoon and Rianda testified application of a multiplier to the average monthly residual stream was a standard practice in the

53

industry to arrive at a purchase price for a merchant portfolio. Rianda also testified the higher the multiple, the greater the residual stream's perceived value. And, as a sub-ISO's residual stream represents its only asset of any real value, the trial court reasonably could conclude that amount was adequate consideration.

The evidence also showed USMS received the same value in consideration for its assets. BCS makes much of the notes in UMS's financial statements stating the acquisition price was lower than that and below market value, as well as the 2017 statement valuing USMS's merchant portfolio at $1.2 million. However, the transaction documents and testimony show that, in addition to the $544,696 in equity in OMS, the consideration for the deal included OMS's assumption of $252,244 in debt that USMS owed UMS. Section 1.4 of the asset purchase agreement specifically provided for OMS to assume USMS's obligations to UMS under four separate promissory notes. In listing those obligations, the section states the total owed on three of the promissory notes is $152,244. The fourth promissory note OMS assumed is simply identified as having a principal amount of $100,000 and having been issued to UMS in December 2014, about three and a half months before the effective date of the agreement. Those two amounts total $252,244—the same amount deducted from the $796,940 valuation in Exhibit 2054, resulting in a difference of $544,696—the amount listed as consideration in the asset purchase agreement.

And, when asked about the $100,000 not included in the total under section 1.4, Yoon said UMS paid that $100,000 to a third party that had a "sub-ownership of USMS," to "clear up that . . . relationship." Fitzsimmons also testified that

54

OMS's assumption of USMS's outstanding loans—effectively relieving USMS of the obligation to pay them back—was part of the consideration paid for USMS's assets. The section on consideration also states the equity interest is "[i]n consideration for the purchase of the Assets *and* the assumption of the Assumed Liabilities." (Italics added.)

Although the underlying issue was different, we find our high court's discussion of the value of an assumption of liabilities in *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767 (*Beatrice*), relied on by defendants, instructive. There, the Court determined a subsidiary corporation's assumption of liabilities for its parent corporation's transfer of assets was sufficient consideration to subject the transaction to sales tax. (*Id.* at pp. 770–771.) As defendants state, our high court in *Beatrice* held:

> "An agreement to assume liabilities is a contractual promise to perform the obligations of another. . . . It is a benefit to the promisee because the promisee may compel the promisor to perform, or, if the promisor does not do so, recover damages from the promisor in the amount or value of the obligations it is compelled to satisfy . . . . That agreement therefore has value equal to the cost to the promisee of paying its debts or fulfilling its obligations. That value constitutes consideration [under the law]." (*Id.* at pp. 782–783.)

Moreover, the evidence showed USMS received as part of the transaction a three-year guaranteed annual consulting fee

of $96,000, and UMS obligated itself to infuse $1 to $1.35 million into the new business, worth, as defendants note, between $266,500 and $359,775 based on USMS's 26.65 percent equity interest.  And, Yoon testified UMS in fact put $1 million into the company.  As defendants also note, this additional value could explain the $1.2 million value assigned to the USMS merchant portfolio in 2017.

Thus, USMS received the following items of value for the sale of its assets:

- 266,500 Class B Common Units, a 26.65 percent interest, of OMS, valued at $544,696;
- the assumption of $252,244 worth of debt;
- the potential issuance and vesting of Class C stock;
- $96,000 per year for a minimum of three years ($288,000 total) in consulting fees; and
- the benefit of $1 to $1.35 million injected into the new business, worth at least $266,500.

The court reasonably could find the consideration USMS received was adequate and would not have abused its discretion in finding no successor liability based on a de facto merger on this factor alone.  Moreover, contrary to BCS's implication, USMS's shareholders Byun and Chuang did not become "owners" of OMS; USMS did.  As owners of USMS, Byun may have seen Chuang and himself as having ownership interests in OMS, but any interest they had was indirect.  And, with a three-year contract to provide OMS with management services, USMS clearly did not liquidate.

### iii. Substantial evidence supports the implied finding that there was no sham sale

BCS contends the asset purchase here was a sham because OMS essentially continued on as USMS. " 'California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations.' " (*Beatrice, supra*, 6 Cal.4th at p. 778.) "However, it is not dispositive that some of the same persons may serve as officers or directors of the two corporations. The relevant inquiries are whether the two corporations have preserved their separate identities and whether recourse to the debtor corporation is available." (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1121.)

BCS argues UMS's consolidated financial statements and notes admit OMS acquired USMS for inadequate consideration. BCS also refers to Rianda's testimony that the revenue stream from a static merchant portfolio typically goes down, not up. We already addressed the substantial evidence that supports finding OMS gave USMS adequate consideration for its assets and the items that could account for the higher valuation in the 2017 financial statement.

As defendants note, the consideration aspect of the "mere continuation" test focuses on whether the asset sale left USMS unable to meet the claims of its creditors. Fitzsimmons testified the amount of consideration was "important" in "every asset

57

purchase transaction . . . where there are liabilities left behind." He explained,

> "That is the case because an acquirer does not want to do a transaction whereby they are rendering the target, the seller, insolvent and potentially [to] be at risk of a fraudulent claim by creditors down the road. [¶] So part of the analysis that one goes through is whether or not the assets that are left behind, in terms of consideration . . . [l]ike, here, potential stream of income[,] are adequate to satisfy any potential liabilities, retained liabilities, these liabilities left behind."

Fitzsimmons testified he went through that analysis on this deal. He was satisfied USMS could pay any retained liabilities with its equity interest in OMS plus the additional Class C units that could vest over time entitling USMS to a profit distribution, as well as the compensation it would receive for a minimum of three years for consulting services.

As defendants note, to satisfy its judgment against USMS, BCS could charge and obtain a lien on USMS's 26.65 percent interest in OMS, and execute on any profits distributed to USMS. (Code. Civ. Proc., §§ 708.310, 708.320.)  Accordingly, substantial evidence supports the trial court's implied finding that USMS did not "lack[ ] sufficient resources after the transfer of [its] assets to meet the claims of its creditors."  (*Beatrice, supra*, 6 Cal.4th at p. 779.)

Nor does the evidence establish OMS and USMS did not "preserve their separate identities."  BCS argues OMS "has practically the same shareholders and management as the seller,

58

and carries on the same business." BCS refers to testimony about UMS's president Yoon having the idea to bring USMS and OMS together and that he decided OMS would be the surviving entity, as well as the fact that USMS's employees began working at OMS, and although its merchants became OMS merchants, Byun did not tell the USMS merchants that the business was now OMS. BCS also notes Byun's testimony about his and Chuang's 20 percent and seven to eight percent ownership interests, respectively, in OMS, their and Su's new titles with OMS, and USMS's lack of existence.

None of that evidence would compel the trial court to find OMS a continuation of USMS requiring it to impose successor liability. First, the trial court could find Yoon's involvement in structuring the transaction unsurprising given his ownership interest in UMS and management of OMS. That OMS acquired USMS's merchants and began to service them also is not untoward. OMS was in the same business as USMS—a sub-ISO—before it acquired USMS's merchant residual stream. USMS may not have been providing merchant services anymore, but it continued to exist as a consultant for OMS, and Byun and Chuang did not actually have ownership interests in OMS. We also can infer the trial court found credible Byun's explanation that USMS had not told its merchants about the change to OMS to avoid confusion.

BCS asserts the primary reason for the sale was for USMS to avoid any liability resulting from this lawsuit but points to no evidence that would compel that finding. We cannot conclude the trial court acted outside the bounds of reason in finding OMS had no successor liability.

59

c. *The amended judgment*

BCS contends the court erred in amending the judgment to no more than $646,746, rather than make the award a cumulative total of $1,077,910 based on the jury's verdict of $646,746 for breach of contract, $323,373 for misappropriation of trade secrets, and $107,791 for breach of duty of loyalty. In its ruling granting defendants' motion to amend the judgment, the court found it could not "discern from the evidence presented at trial, or [BCS's] pleading in this matter, that the awards offered by the jury were separated according to different factual predicates as [BCS] suggest[ed]." Rather, the court agreed with defendants that the three causes of action "relied on essentially the same factual bases or were included in the broad factual basis underlying the First Cause of Action for Breach of Contract." We agree.

"Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158–1159.) "In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Id.* at p. 1159.)

BCS argues its causes of action were not duplicative because the California Uniform Trade Secrets Act (UTSA) does not preempt " 'contractual remedies, whether or not based upon

60

misappropriation of a trade secret, [or] . . . other civil remedies that are not based upon misappropriation of a trade secret.' " (Citing Civ. Code, § 3426.7, subd. (b); *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 506.)  BCS asserts its breach of contract and breach of loyalty claims have independent bases from its trade secret claim:  the contract claim arose from the individual defendants' disclosure of confidential information obtained during their employment, irrespective of whether the information consisted of trade secrets, and their solicitation of BCS's employees, which impaired the El Monte office's growth and profitability independent from the misappropriation of trade secrets; the misappropriation of trade secrets arose from confidential information the individual defendants wrongfully appropriated when they left BCS; and Su's breach of loyalty was dependent on his having moved BCS customers to its competitors irrespective of whether he used trade secrets.

Substantial evidence supports the court's findings that the same conduct underlies the three causes of action.  The court did not base its ruling on a finding that the UTSA preempted BCS's non-trade secret claims.  As the court noted, BCS's breach of contract cause of action related to the individual defendants' misappropriation of BCS's "trade secret information, including, without limitation, confidential customer lists and merchant applications detailing the financial information of Plaintiff's merchants, by soliciting the services of UMS[ ] to Plaintiff's customers, by disclosing Plaintiff's trade secrets to others, by switching the credit card processing services of dozens [of] Plaintiff's merchants to UMS[ ], and by using Plaintiff's trade secret information to their own advantage, and to the advantage of Plaintiff's competitors."  The cause of action for

61

misappropriation of trade secrets, in turn, attacked defendants' use of "merchant lists, merchant files, compilations of BCS sales roster files, merchant data files including merchant volume, pricing information, profit margins, risk analysis and charge back data, among other information." And, the breach of loyalty cause of action against Su was based on his moving a BCS merchant to a competitor defendant.

Thus, as the trial court found, the misappropriation of trade secrets and breach of loyalty causes of action are based on the same injury included in the breach of contract cause of action—essentially, the use of BCS's trade secrets and switching of BCS's customers to its competitor. BCS's breach of contract cause of action thus encompassed the same harm BCS suffered due to defendants' misappropriation of its trade secrets and Su's breach of his duty of loyalty. (See *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1181–1182, cited by defendants [plaintiffs' suit for wrongful death and three other causes of action "consisted of but one true 'cause of action,' . . . for the injury they had suffered as a result of the wrongful death of the decedent . . . , and the four 'causes of action' were actually counts based on the same primary right of plaintiffs and the same primary duty of defendants, each of which merely alleged additional circumstances out of which the primary right and primary duty arose"].)

Moreover, as defendants assert, during the trial, BCS did not attempt to associate defendants' particular conduct with a specific cause of action. Indeed, BCS's entire theory of damages—that El Monte would have continued to grow, as Westminster did, but for defendants' wrongful conduct—did not differentiate between the harm defendants' misappropriation

of BCS's merchant data had on its business versus the damage incurred due to BCS's loss of its employees from defendants' solicitation of them.  BCS's expert testified he made no such differentiation in his damages calculus.

As the trial court noted, the jury was instructed to award damages for breach of contract, under Civil Code section 3300, in an amount that " 'will reasonably compensate [BCS] for the harm caused by the breach.' "  As substantial evidence supports the trial court's finding that there was no other item of harm " 'not otherwise included within the compensatory award for breach of contract,' " the court did not abuse its discretion when it corrected the judgment to the limitations of the $646,746 award for breach of contract.  (Citing *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 995–996 [modifying judgment where compensatory award for breach of contract included harm based on fraud judgment].)

## DISPOSITION

We affirm the judgment.  The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P.J.                                              LAVIN, J.